UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

BOBBY G BOYCHER ET AL                    CASE NO.  2:24-CV-01391

VERSUS                                   JUDGE JAMES D. CAIN, JR.

USA                                      MAGISTRATE JUDGE LEBLANC

MEMORANDUM RULING

On March 9, 2026, the court held a one-day bench trial on plaintiff Sara Boycher's claims of personal injury against the United States of America under the Federal Tort Claims Act ("FTCA"). Having considered the evidence and applicable law, as well as the post-trial memoranda submitted by the parties, the court now issues its ruling.

I.
BACKGROUND

This suit arises from a motor vehicle accident that occurred on February 5, 2021, in Vernon Parish, Louisiana. Doc. 1. On that date, Frank Boycher was driving with guest passengers Bobby Boycher and Linda Boycher (his parents) and Sara Boycher (his 16-year-old niece) in a 2006 Ford Taurus owned by Brenda Boycher (his sister). The vehicle was proceeding in an easterly direction on LA 28 in the inside travel lane, approaching the intersection with LA 121. At the same time Sergeant Laura Oklapek was driving a military Humvee northbound on LA 121, approaching its intersection with LA 28. Plaintiffs alleged that Sergeant Oklapek "suddenly and without warning . . . drove the Humvee past a yield

control device from LA 121 out onto LA 28," resulting in a violent collision with the Boychers' vehicle. Doc. 1, ¶ 7.

The occupants of the Boycher vehicle, who served as the original plaintiffs[1], provided notice of their claim via SF95 forms. *Id.* at ¶ 4. The administrative process concluded without settlement. *Id.* Plaintiffs then timely filed suit in this court against the United States on October 10, 2024, seeking to recover for the bodily injury and property damage sustained in the crash through the Federal Tort Claims Act ("FTCA"). The government has admitted that Sergeant Oklapek was acting within the course and scope of her employment as an active-duty soldier with the U.S. Army at the time of the accident and that the suit thus falls under the FTCA. Doc. 5, p. 6. A settlement was reached with all of the plaintiffs except Sara Boycher. *See* doc. 39. The matter then proceeded to a bench trial, where the government contested both liability and the quantum of Ms. Boycher's damages. After considering the testimony of witnesses and exhibits entered into evidence, as well as the post-trial briefs filed by both parties, the court now makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that a conclusion of law constitutes a finding of fact, the Court also adopts it as such.

---

[1] Bobby Boycher passed away in January 2025 and his wife, Linda Boycher, and adult children Frank and Brenda Boycher were substituted in a survival action. Docs. 9, 17.

## II.
### FINDINGS OF FACT & CONCLUSIONS OF LAW

### A.  The Accident

#### 1.  Evidence adduced at trial

Sergeant Oklapek was assigned to the Criminal Investigation Division ("CID") of a
military police battalion stationed at Fort Polk, Louisiana. Doc. 42, att. 12, pp. 11–12. On
the morning of February 5, 2021, she was coming off a 24-hour rotation and had been
awake for approximately 30 hours. *Id.* at 13–14. She was driving northbound on LA-121
back to Fort Polk to return the Humvee before she could go home. *Id.* at 14–16. At about
9:30 am she reached the intersection with LA-28, which has a stop sign for vehicles
traveling north on LA-121. *Id.* at 17–18. Her view of traffic on LA-28, a four-lane highway,
was obstructed by a convoy of military vehicles stopped in the outside eastbound lane of
LA-28. *Id.* at 17–19, 32. Sergeant Oklapek waited about a minute and then proceeded into
the intersection, despite her obstructed view. *Id.* at 19. At the same time, the Boychers'
vehicle approached from the inside lane of LA-28 East, which did not have a stop or yield
sign. *Id.* at 32, 61. Mr. Boycher had his cruise control set to 65 mph, the speed limit for
LA-28. *Id.* at 61. The two vehicles collided, resulting in injuries to both Sergeant Oklapek
and Sara Boycher. *See* doc. 42, atts. 5 & 12.

#### 2.  Liability

The FTCA, 28 U.S.C. § 2675(a), is a limited waiver of the government's sovereign
immunity for certain tort claims brought against employees of the United States under the
doctrine of respondeat superior. It provides district courts with jurisdiction over claims

based on the negligent or wrongful acts of government employees "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 2675(b). Accordingly, the court applies the tort law of the state where the alleged injury occurred—in this case, Louisiana—to determine the government's liability. *Villafranca v. United States*, 587 F.3d 257, 260 (5th Cir. 2009).

Louisiana courts determine liability for negligence based on a duty-risk analysis. *Long v. State ex rel. Dept. of Transp. and Dev.,* 916 So.2d 87, 101 (La. 2005). Through this test the plaintiff must show all of the following:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (citing *Lemann v. Essen Lane Daiquiris,* 923 So.2d 627, 633 (La. 2006)). The percentage of fault of all persons causing or contributing to an injury must be determined by the factfinder. *Hankton v. State*, 315 So.3d 1278, 1282 (La. 2020). In making this determination courts look to the factors set forth in *Watson v. State Farm Fire & Casualty Insurance Company*, 469 So.2d 967 (La. 1985), including:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significant of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of

course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Id.* at 974.

The court previously denied summary judgment on the issue of liability, ruling that Frank Boycher might bear some fault due to a failure to reduce speed when moving around the convoy. The summary judgment record invited credibility determinations as to how long Sergeant Oklapek waited and at what speed she entered the intersection. It also "contain[ed] only vague, verbal (rather than visual) descriptions of the convoy," preventing the court from determining whether Mr. Boycher's decision to continue around the convoy or failure to reduce his speed amounted to comparative negligence. Doc. 22, pp. 5–6. But the record at trial establishes that the convoy was limited to three vehicles. Mr. Boycher had no stop or yield sign, and did not need to reduce his speed to safely move around the convoy. Instead, the sole fault for the accident lies with Sergeant Oklapek for proceeding into the intersection even though she evidently could not see around the convoy to oncoming traffic in the other lane. Accordingly, the government is 100% liable for Sara Boycher's resulting injuries.

## B. Quantum of Damages

### 1. Treatment history

Ms. Boycher was a sixteen-year-old high school student at the time of the accident. Tr., pp. 71, 73. By February 2021 she was attending school at home due to the COVID-19 pandemic, but prior to that she played basketball and participated in 4-H Club at school. *Id.* at 71–72. On February 5, 2021, she was riding in the back seat on the right side of the

vehicle and wearing her seatbelt. *Id.* at 73–74. Upon impact, she testified, she felt herself pulled forward and began to experience an aching pressure in her lower back over the next few days. *See id.* at 75–76. The pain grew worse, becoming debilitating. *Id.* at 76.

Ms. Boycher first sought treatment through orthopedist Dr. David DeLapp on February 22, 2021. Doc. 42, att. 5, p. 1. Dr. DeLapp diagnosed a "[p]robable herniated disk L5-S1 with questionable mild radiculopathy in L5 distribution," pending an MRI. *Id.* at 4. He referred Ms. Boycher for physical therapy. *Id.* at 4–5. According to Dr. DeLapp's notes, Ms. Boycher delayed physical therapy because she and her grandparents (with whom she resides) were nervous about COVID exposure. *See* doc. 42, att. 5, pp. 4–5. She completed eight sessions between May 13 and June 14, 2021. At that point her physical therapist determined that she was progressing but had not reached maximum rehabilitation potential. Doc. 42, att. 9, p. 4. However, Ms. Boycher only went to one more physical therapy appointment in 2021. Tr., p. 87. She continued to see Dr. DeLapp in July and September 2021, and he recommended that she continue physical therapy. Doc. 42, att. 5, pp. 11–13. He also obtained an MRI in September 2021, which showed an "L4-5 disk bulge with moderate to severe bilateral neural foraminal narrowing, L5-S1 herniation with moderate bilateral neural foraminal narrowing." *Id.* at 11.

In November 2021 Ms. Boycher saw Dr. Utter, who recommended following up after adjusting her medications and trying physical therapy again. Doc. 42, att. 7, pp. 38–39. Ms. Boycher resumed physical therapy in March 2022. Doc. 42, att. 9, p. 6. In April 2022, she reported to her physical therapist that her back pain was now intermittent and that she was doing better overall. *Id.* at 8. In June 2022, however, Ms. Boycher had only

managed to complete a few additional sessions and reported to her physical therapist that her pain was increasing. *Id.* at 10–11. She testified that physical therapy only gave her partial relief. Tr., p. 77. In July 2022 she reported ongoing pain to Dr. DeLapp, who recommended following up with Dr. Utter and continuing physical therapy. Doc. 42, att. 5, p. 25. In August 2022 Dr. Utter recommended that Ms. Boycher continue physical therapy and scheduled her for bilateral L4-5 and L5-S1 medial branch blocks. Doc. 42, att. 7, p. 34. Dr. Rama Letchuman conducted these procedures in October 2022 and February 2023. Doc. 42, att. 8, pp. 1–6. The nerve blocks were used as a diagnostic tool to confirm the source of Ms. Boycher's pain, and she reported a reduction in her pain level from 6 and 7/10 to 0/10 within 30 minutes of each procedure. *Id.* at 4, 6. However, the blocks only provided short-term relief. Tr., p. 79. Accordingly, she asked to proceed to the next step: a radiofrequency ablation ("RFA"). Doc. 42, att. 8, p. 6.

Ms. Boycher underwent a bilateral L4-5 and L5-S1 RFA in April 2023 with Dr. Letchuman. *Id.* at 8–10. Again, she reported reduction in pain from 7/10 to 0/10 within 30 minutes of the procedure. *Id.* at 10. She underwent nerve blocks, both times at L1-2 and L2-L3, in March and May 2024. *Id.* at 11–16. She reported both procedures as successful at reducing her pain to 0/10 but that her pain returned in between. *Id.* at 11–16. She then had a bilateral L1-2 and L2-3 RFA in June 2024 and another RFA at L4-5 and L5-S1 in July 2024. *Id.* at 17–22. In September 2025 she underwent a bilateral RFA at L1-L2, L2-L3, L3-L4, L4-L5, and L5-S1. *Id.* at 35–37. She reported that the pain had recently returned and that the procedure decreased her pain level from 6/10 to 0/10 within 30 minutes. *Id.*

### 2. Sara Boycher testimony

Sara Boycher testified that she led an active life, including playing basketball, before the accident.[2] Tr., p. 72. After the accident, she attempted to return to the sport but was unable to play because it increased her back pain. *Id.* at 82. Before the ablations, she managed the pain with muscle relaxers but felt constant discomfort and was unable to stay in one position for long. *Id.* at 80–81. She also had difficulty sitting through class. *Id.* at 82. After high school she found employment in companion care, which requires cleaning and cooking for clients. *Id.* at 83–84. The ablations provide her with complete pain relief. *Id.* at 79–80. Eventually, however, the nerves grow back and the pain returns. *Id.* When the pain returns, she is unable to complete her job duties. *Id.* at 84.

### 3. Opinion testimony

At trial the court heard from plaintiff's pediatrician, Dr. Robert Crowe, as well as her treating orthopedists, Dr. David DeLapp and Dr. Rama Letchuman. The government introduced testimony from defense IME expert, Dr. Neil Romero.

Dr. Romero evaluated Ms. Boycher based on her medical records and did not examine her. Tr., p. 8. He is an orthopedic spine surgeon and does not purport to offer any expertise in interventional pain management. *Id.* at 9–10. From Ms. Boycher's MRI he identified only mild disk bulging at L4-L5 and L5-S1, rather than herniation. *Id.* at 13–14. He believed that she reached maximum medical improvement for any lumbar issues after completing her first round of physical therapy in June 2021. *Id.* at 15. He based this on the

---

[2] These activities were also curtailed by the COVID-19 pandemic. Ms. Boycher testified that she lived with her grandparents at the time and her medical records, *supra*, reflected that she delayed starting physical therapy due to concerns about COVID exposure.

documentation of relief after eight visits and the lack of any follow-up therapy for several months following. *Id.* He disagreed with the recommendation for 20 years of RFAs, arguing that it was unlikely that she would follow through with this frequency and that repeating the procedure so often could also cause serious side effects. *Id.* at 21–24. Finally, he opined that her lumbar spine issues predated the accident based on her pediatric records. *Id.* at 14–15, 27–28. He admitted, however, that he had not reviewed Dr. Crowe's deposition and that her pediatric complaints often involved the neck and upper back, with general backache complaints sometimes appearing along viral symptoms. *Id.* at 27–32. Additionally, his report documented that she underwent only 18 physical therapy visits between March 2023 and January 2024 and experienced "significant relief" at the end of this period. Doc. 44, att. 1, p. 2. But records show that she underwent 37 visits during this period and reported intermittent back pain "up to 7/10 at worst" at her last visit. Doc. 42, att. 9, pp. 28, 36–59.

Dr. Crowe, a pediatrician, testified that he began treating Ms. Boycher in 2008. Doc. 45, att. 3, pp. 10–11. From that time until the accident in February 2021, he had several clinical encounters with her. *Id.* Ms. Boycher complained of back pain at some of these encounters, but Dr. Crowe identified causes such as neck strain from karate, sleeping with too many pillows, and myalgia following a viral illness. *Id.* at 13–21. Based on his review of her pre-accident records, he found nothing to indicate that she was having ongoing issues with her lumbar spine. *Id.* at 24.

Dr. DeLapp summarized his treatment of Ms. Boycher after the accident, as reflected above. On examination Ms. Boycher reported pain in her lower back and reduced

sensation over the medial border of her foot. Doc. 43, att. 3, pp. 7–8. Her X-ray showed diminished disc height at L5-S1 and a positive flat back sign. *Id.* at 10. He diagnosed a probable herniated disc with questionable mild radiculopathy. *Id.* Ms. Boycher continued to report pain through her follow-up visits. *Id.* at 13–14. Her MRI in September 2021 revealed an L4-L5 disc bulge with moderate to severe bilateral neural foraminal narrowing as well as L5-S1 herniation with moderate bilateral neural foraminal narrowing. *Id.* at 15. Because Dr. DeLapp does not perform surgery, he referred Ms. Boycher to Dr. Utter, whose treatment is summarized above. *Id.* at 15–16. On visits in 2022, Dr. DeLapp performed tests that ruled out malingering or symptom exaggeration. *Id.* at 19. He last saw Ms. Boycher after her RFA, in October 2025, and his findings remained unchanged. *Id.* at 21–22. He found Ms. Boycher consistent in her presentation of symptoms and sincere in her desire to get well. *Id.* at 28–30. He was aware of her inconsistent physical therapy attendance, but viewed this as understandable given her life circumstances and restrictions during the COVID-19 pandemic. *Id.* at 34–35. He agreed with the recommendation for another 20 years of RFAs, stating that her current condition was "not going away" and could potentially worsen over time. *Id.* at 36. He also agreed that the February 2021 accident was probably the cause of her issues at L4-L5 and L5-S1. *Id.* at 27–28. However, he was unaware of her specific back pain complaints to Dr. Crowe on prior pediatric visits. *Id.* at 33.

Dr. Letchuman testified that Ms. Boycher was referred to him for pain management after Dr. Utter determined that she was not a surgical candidate. Doc. 43, att. 4, pp. 8–9. His diagnostic nerve blocks in October 2022 and February 2023 confirmed her issues at

L4-L5 and L5-S1. *Id.* at 19–23. Accordingly, Dr. Letchuman proceeded to an ablation for long-term pain relief in April 2023. *Id.* at 23–26, 31. This procedure involved cauterizing some of the nerves involved, and proved successful. *Id.* at 31. When Ms. Boycher returned for a follow-up in August 2023, she was still experiencing some pain. *Id.* at 31–33. Dr. Letchuman discussed her prognosis and Ms. Boycher indicated that she was still following the home exercise program recommended by her physical therapist. *Id.* at 33–36. He conducted another ablation on her upper lumbar spine in March 2024, which provided additional pain relief. *Id.* at 41–44. At a follow-up in November 2024, Ms. Boycher reported 90 percent pain reduction in her lower back. *Id.* at 46–48. He saw her again in September 2025 and determined that another ablation was warranted due to returning pain. *Id.* at 48–49.

Upon review of Ms. Boycher's pediatric records, Dr. Letchuman found nothing to indicate that her lower back issues predated the accident. Although she had complained of back pain occasionally, it was rarely specified as lower back pain and often arose with other viral symptoms. *Id.* at 54–56. He also disagreed with Dr. Romero's diagnosis of muscle strain, stating that her symptoms were inconsistent with such an issue and it would be impossible to rule out joint issues without a physical exam. *Id.* at 58. He found no indications of symptom exaggeration or malingering. *Id.* at 59–60. Absent any record of previous car accidents, he found that the February 2021 accident was the most likely cause of her symptoms. *Id.* at 59.

Dr. Letchuman believed 20 years of annual RFAs would be necessary, both due to nerve generation between procedures and because of his expectation that new treatments

might develop in that time to permanently address Ms. Boycher's pain. *Id.* at 61–62. He also recommended a course of six sessions of physical therapy with each RFA, to emphasize posture ergonomics and prevent further injury. *Id.* at 64. He stood by this recommendation as the ideal despite Ms. Boycher's infrequent physical therapy attendance. *Id.* at 73–75. He further explained that an annual visit with either himself or Dr. Utter was warranted in order to evaluate Ms. Boycher before her next RFA and order physical therapy. *Id.* at 79–80. Finally, he advised that X-rays and MRIs would be necessary to monitor her condition. *Id.* at 65. He admitted that Dr. Utter had not ordered new imaging studies with her last RFA, likely because Ms. Boycher was not reporting any new problems, but argued that an allowance should nonetheless be made for annual imaging studies so that a physician could order them if indicated. *Id.* at 83–85.

### 4. Life care plan

A life care plan was prepared by Dr. Ashley Lastrapes in September 2025, in consultation with Dr. Letchuman, and entered into evidence at trial. *See* doc. 43, att. 1. In this document Dr. Lastrapes focused on Ms. Boycher's need for future medical care, projecting annual RFAs and associated physical therapy (one evaluation and six treatment sessions per annum). Doc. 43, att. 1, pp. 6–7. She also projected a need for lumbar MRIs and X-ray every three years for the next 20 years. *Id.* at 7. For physical therapy, she projected costs of $11,000.00 to $45,260.00 based on $100.00 to $205.00 per evaluation and $75.00 to $343.00 per treatment session. *Id.* at 6. For the annual RFAs and associated procedural visits, the projected costs of $800,823.60 to $1,278.220.00 based on $39,826.18 to $63,582.00 per RFA, $300.00 to $510.00 per initial visit, and $200.00 to $304.00 per

follow-up visit. *Id.* The report, however, did not take into account the RFA Ms. Boycher had on September 9, 2025. Tr., pp. 111–12.

Dr. Lastrapes testified that her cost estimates were drawn from the actual prices quoted by nearby providers. *Id.* at 104–05. She acknowledged that Physical Therapy Services of West Louisiana, where Ms. Boycher had her earlier physical therapy, charged a maximum of $225.00/session. *Id.* at 114. She also acknowledged that the estimate of $39,826.18 for the RFAs came from Dr. Letchuman, who performed that same procedure on Ms. Boycher in September 2025. *Id.* at 112–13. She did not review billing records from this procedure, which show that the facility cost for the RFA was $11,901.27 while Dr. Letchuman's fees totaled $9,128.00. *Id.*; *see* doc. 42, att. 11, pp. 30–32. She testified that facility costs could vary from year to year and that RFA costs would also be higher for a bilateral procedure. Tr., p. 118. But Ms. Boycher's medical records show that she underwent a bilateral RFA, the same procedure recommended for the next 19 years, in September 2025. The doctor and facility fees charged for this procedure fell short of Dr. Letchuman's own projections by nearly 50 percent. Accordingly, the court does not consider the projected costs used by the life care plan for this procedure and associated care to be reliable. Instead, it will rely on the actual costs discounted to present value. The parties have submitted supplemental briefs and expert reports on this basis. Again the parties arrive at different results, with plaintiff's economist Dr. Lamar Jones adjusting his low net present value to $596,684.00 and defendant economist Dr. John Page setting the figure at $292,332.45. *Compare* doc. 51 *with* doc. 53. Dr. Jones used an annual rate of cost advance of 5.1 percent and an annual discount rate of 3.1 percent, based on one-year U.S.

Treasury bills. *See* doc. 43, att. 2, p. 2. Dr. Page used a range of real discount rates from 0.58 to 2.67 percent, based on the set of yields to maturity currently available in inflation-indexed U.S. Treasury bonds. He also

> assumed that all care costs will experience cost increases in the range of one percent below to one percent above the average of the five year and long term historical real (above or below overall inflation) rates as reported for that care type by the U.S. Bureau of Labor Statistics in its detailed consumer price index data.

Doc. 53, p. 6. Neither economist was subject to traversal or cross-examination on his methodology. Nevertheless, the figure arrived at by Dr. Page represents less than the current cost of the procedure multiplied over 19 years and strains credibility. Accordingly, the court will follow Dr. Jones's calculations and finds that $596,684.00 covers the cost of the prescribed 19 remaining RFAs.

### C. Damages

"The FTCA authorizes civil actions for damages against the United States . . . under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). Louisiana substantive law applies here. The court uses this law to analyze plaintiff's claims for past and future medical expenses as well as general damages.

In a tort case, the plaintiff generally has the burden of proving each element of her claim—including causation of damages—by a preponderance of the evidence. *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993). A plaintiff may recover for past and future medical expenses caused by the defendant's tortious conduct. *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010). The plaintiff must establish, however, that she "incurred

past medical expenses in good faith as a result of [her] injury and future medical expenses will more probably than not be incurred." *Id.* The factfinder is given great deference in its assessment of quantum for both general and special damages. *Guillory v. Lee*, 116 So.3d 1104, 1116 (La. 2009). Where the finding is based on determinations relating to the credibility of witnesses, the award can only be overturned on a showing of manifest error. *Jones v. Bravata*, 980 So.3d 226, 233 (La. Ct. App. 1st Cir. 2019) (citing *Adams v. Rhodia, Inc.*, 983 So.2d 798, 806 (La. 2008)).

The parties have submitted a joint stipulation of past medical charges, with the government reserving the right to challenge the reasonableness of these expenses and whether they are related to the subject accident. Under this stipulation the past medical expenses claimed by plaintiff total $132,292.93. Doc. 42, att. 11. Plaintiff also claims future medical expenses, as outlined in the life care plan above, and general damages for her past and future pain, suffering, and loss of enjoyment of life.

The government maintains that Ms. Boycher is only entitled to past medical expenses up to the time she reached maximum medical improvement, according to Dr. Romero's testimony, in June 2021. It also requests, if plaintiff is entitled to all past medical expenses claimed, that the court make a reduction for two late cancellation fees of $100 apiece incurred by plaintiff for failing to attend appointments at the Counseling Center of West Louisiana. The government maintains that future medical expenses are not warranted, based on Dr. Romero's testimony, and that if the court determines that future RFAs are indicated, then the costs claimed by plaintiff are too high and physical therapy and imaging are not warranted. Finally, it maintains that general damages should not exceed

$125,000.00 based on the award made by this court in *O'Key v. United States*, 2022 WL 1813952 (W.D. La. June 2, 2022).

Regarding all of Ms. Boycher's past care, the court finds it reasonably related to symptoms caused or exacerbated by the accident and incurred in good faith. Dr. Romero's opinions as to possible preexisting conditions do not persuade the court, in light of the varying nature of the back pain complaints in her pediatric record and his own failure to examine the patient and establish an alternate cause. An award of her full past medical expenses of **$132,092.93** (representing the joint stipulation minus the $200 in unexplained cancellation fees) is therefore justified.

The court also finds that future medical treatment, at least in terms of 19 years of RFAs, is warranted and reasonably related to the accident. Ms. Boycher only reported lasting pain relief after her first RFA and followed through with a second one a little over a year later, when her symptoms returned. Plaintiff fails to establish the necessity of future imaging and physical therapy, however. Despite Dr. Letchuman's recommendation and her own expression of willingness to return to physical therapy, she has not followed through. She also reported complete pain relief from the RFAs alone. And the RFAs proceeded without any updated imaging, belying Dr. Letchuman's testimony as to their medical necessity. Finally, while Dr. Letchuman testified that an annual pain management office visit should occur prior to each RFA, it does not appear that one was billed before her procedure in 2025.[3] *See* doc. 42, att. 11, p. 32. The court is also unable to determine the net

---

[3] Ms. Boycher did see Dr. Utter in October 2025, after her RFA. *See* doc. 42, att. 7, pp. 21–22. Dr. Utter charged $264.00 for this visit. Doc. 42, att. 11, p. 12.

present value of these visits because Dr. Jones's initial report aggregated the office visits and procedures in the reduction, and his supplemental report included only the procedures. Additionally, the court notes that while sporadic follow-ups may be required, the fact that RFAs have not occurred on a strict 12-month schedule will leave sufficient room in the costs awarded to cover occasional office visits. Accordingly, the court will award **$596,684.00** for future RFAs as the total of plaintiff's future medical costs.

As for general damages, the plaintiff offers no comparison cases. The government does not dispute that general damages are justified, and points to a few comparison cases. The most relevant of these is *O'Key*, supra, where this court awarded $125,000.00 to a 33-year-old plaintiff who suffered bulging and herniation at L4-L5 after a collision with a mail truck.[4] 2022 WL 1813952 at *9. The plaintiff underwent two RFAs to address his lower back pain and was recommended to receive RFAs every ten years. He testified that his back injuries limited his ability to play sports with his sons. However, the injuries did not impact his work building scaffolding and he had not pursued physical therapy. *Id.* at *10–*11. Ms. Boycher credibly testified as to the social and occupational impacts of the accident. She pursued physical therapy and then RFAs to treat her injuries, and will likely require regular treatment for recurrences. Given her young age when these impacts began, the treatment she has undergone and will continue to require, and the dramatic nature of

---

[4] The government cites *Miles v. Cummings*, No. C-676834 (La. Dist. Ct. 19th JDC Sep. 24, 2020), in which the plaintiff suffered lumbar disc bulges and "treated conservatively with chiropractic and epidural steroid injections," and *Jackson v. Fitzgerald*, 2016 WL 6570384 (La. Dist. Ct. 19th JDC Mar. 28, 2016), in which a jury awarded $102,500.00 in general damages, $28,000.00 in past medical expenses, and $16,000.00 in future medical expenses to a plaintiff who suffered lumbar facet joint pain after an automobile accident and received an ablation, physical therapy, and a medial branch block. There is no information as to the age of either plaintiff or the impact of the injury on his/her occupation and hobbies. But in both cases, both the past and future medical treatment appear significantly less than what Ms. Boycher has endured and will endure to treat her injury.

the accident itself, the court finds that an award of **$200,000.00** is sufficient to address her

past and future pain, suffering, and loss of enjoyment of life.

## III.
### CONCLUSION

For the reasons stated above, judgment will be entered for the plaintiff Sara Boycher

in the following amounts:

- **$132,092.93** in past medical costs

- **$596,684.00** in future medical costs

- **$200,000.00** in past and future pain, suffering, and loss of enjoyment of life

**THUS DONE** in Chambers on this 29th day of April, 2026.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**